The Judges of the United States Court of Appeals for the Eighth Circuit Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this Honorable Court may now draw forward and they will be heard. God save the United States and this Honorable Court. Please be seated and please call the case on our calendar this afternoon. 20-1328 Zhaojie He et al. v. Merrick B. Garland Very good. Ms. Wadey, I'm not sure how you'd like your name pronounced, but you're up and you can introduce yourself. May it please the Court, Your Honors. Nadia Yanaweed for Petitioner Zhaojie He. I'd like to thank the Court for appointing our clinical program to represent Mr. He and for being so accommodating in the schedule oral argument in this case. Present with me in the room are my co-counsel and our cohort of clinical law students behind me, including Ms. Ashley Meeder, our student who has worked very diligently on this case. Well, we always welcome participation of a student clinic. You always do a good job and are helpful and I know it's a valuable experience. So all are welcome. Very grateful, Your Honor. This Court must reverse, vacate, and remand. It is no exaggeration to say that since our founding, our country has abhorred the notion that governments may constrain an individual's right to freely practice his faith, let alone break up a church service, not once, but twice, beat an incarcerated worshiper, and expressly warn that he cannot attend his church again. Yet that is precisely how the totalitarian Chinese regime suppressed Mr. He's free religious practice, causing him to flee China for a country where he can freely attend his church and worship a god of his own choosing. This Court should therefore hold that Mr. He suffered past persecution as a matter of law under the INA. Counsel, does the record show whether the persecuting officials were local or national? The record demonstrates that they were local, but as part of the Chinese government's concerted effort to suppress free religious practice throughout the entirety of China. And I think it's very important to start with what the facts here, the record, establishes. It establishes a totalitarian regime that tells people precisely what to think, how to act, and what to believe in. And the Chinese Communist Party controls every aspect of religious life in China and only permits individuals to practice in churches strictly under its control. And so when Mr. He discovered Christianity and attended a church that expressly rejects that government control, the Chinese government engaged in a concerted effort to suppress his free religious practice. The first time he attended an underground Christian church that by definition... Counsel, there's a big difference between a lack of religious freedom and persecution. So where in the record is the line drawn and how is it drawn? In other words, the registered churches, Mr. He says, well, I can't go to them because they believe that they put the party above God. So that establishes by itself a well-founded fear of persecution? Many courts, Your Honor, have in fact held that if you are prohibited, prevented from freely practicing your religion, that is religious persecution under the INA. Best case for that? Supreme Court's never held that. That's right, Your Honor, but I have several. And I believe that you're... Are they all in your brief? Yep. Because I've read most all of them in your brief. I believe that this court in particular recognized as much involved in Michael. Certainly you didn't hold. So they didn't hold as much. But it said that it recognized that a petitioner would be prevent, would be, excuse me, be held to suffer past persecution if he were prevented from practicing his religion. And the record decision, Seventh Circuit that cited in our brief says, if you are forbidden to practice your religion, that is religious persecution. And in that case, it held that the GIA aired when it concluded that a Jehovah's Witness had not been persecuted despite the Eritrean government's prohibition of his faith. The court in Zhang, that's the Ninth Circuit case, stated that it's religious persecution. Religious persecution can take many forms. That's where the Ninth Circuit started from. And then it said that it is religious persecution to be prohibited from worshiping in public or in private. Counsel, did the IJ or the BIA actually find that he was completely prohibited from practicing his religion? I think that the facts here demonstrate that. And that is the legal standard that we are asking the court to adopt or more forcefully recognize beyond worlds of Michael. And then whether that actually happened is a fact intensive inquiry that has to be engaged in based on the facts as established in the case. I would point. Well, doesn't that pose a problem for you, though? Because, I mean, I think you're hinting that the IJ didn't actually find these things and would need to make more findings in order to say he was completely prohibited from practicing religion. Am I reading you correctly? No, Your Honor. And I don't think that the standard is being completely prohibited from practicing religion. I would point the court in particular to the Ninth Circuit's decision in Google that says that it's religious persecution case law focuses on the degree to which the facts in the case established that the applicant was prevented from practicing his religion. The reason why I'm having trouble with this is the country report says that there are state registered, state authorized churches. And I realize that your client doesn't like those state authorized churches, doesn't think that they would be fulfilling enough. But it gets back to Judge Logan's questions, which is if you have an opportunity to go to these churches, which are within his Christian denomination, then how is he completely prohibited from practicing his religion? Your Honor, respectfully, I think that we are starting from the proposition that the Chinese government completely controls the faith that's practiced in those churches. And there is a plethora of evidence in the record, for example, that faculty at government-controlled seminaries are directed to engage in theological reconstruction to make Protestant doctrine conform to socialism. That's at AR 227. But now wait, now wait a minute. So you're making, this is not a religious argument, this is a political argument. It's not a political argument. You're arguing, in effect, that every person in China who claims to be a Christian or can demonstrate he or she is of the Christian faith and refuses to go to recognized Christian churches is entitled to asylum without more. I have two points to that, Your Honor. Courts respectfully have quite frankly held that such a floodgates argument is irrelevant to an individual's asylum claim. And Mr. Haidt is coming forward with his own claim to religious persecution based on the facts that happened to him. And I think that another response... But he doesn't have the facts. I respect... Then you get into the standard of the Eighth Circuit law as to what's past persecution. I respectfully disagree, Your Honor. I think that this shows, as in Guo and Xi, an egregious suppression of free religious practice that was not just isolated incidents in the way that this court has previously rejected in cases like Noguri, for example. What the facts here show is a concerted, and I'm quoting Noguri, a continuing effort to persecute on a basis of an enumerated factor in the statute. Wait, there were two incidents and he left. Where's the pattern or practice? The agency said there isn't one. It wasn't proved. It's not a pattern or practice, Your Honor. It's looking at the totality of the circumstances in this case. Over a course of six months. Your Honor, I'm not aware of, respectfully, any case law that puts a time limitation on asylum or that requires asylum applicants to undergo years of persecution before they can qualify under the statute. And what is demonstrated by these facts is the fact that he did go to church. He was punished for doing so, expressly told, you are not to go to that church anymore. He went to a home gathering, which he testifies was a church. And the record establishes, as does case law, that those are actual Christian churches. Case law can't establish that. What prior circuit case involved his home church? None, Your Honor. That's a fair point. But I think the record here, I guess what I'm trying to say is that it's not a secret that these underground house churches are, in fact, churches. And that's not only demonstrated in the record here, but in many cases that have considered similar claims. In terms of persecution, is there a difference between, in terms of your argument, having to practice your religion, having to attend churches you would not prefer to attend because they don't perfectly reflect your views. And being completely prohibited, saying no Christians may practice in the country. Isn't there a qualitative difference between those two things? I think that there is, Your Honor. And I am not, we are, our position is not that any prevention, any prohibition on your religious practice may qualify for asylum. And that's why I point the court to Guo. That focuses on what the facts show and the degree of persecution or the degree of harm that is demonstrated under the facts. And so, and I would say, Your Honor, I am respecting Guido. Guo was so fact-specific and oriented to prior Ninth Circuit case, or prior Ninth Circuit case. I can't borrow anything from Guo to draw, of a line-drawing nature. I think, I, Guo. Where is it that, when did this become Guo? By looking at the totality of the circumstances of what happened to Mr. He, Your Honor. And by looking at the fact that he went, this is an 18-year-old who was discovering his faith. And went to church twice and was incarcerated for 45 days. Where in Guo, the petitioner was detained for two days. That's 20 times, Mr. He was detained 20 times more than the petitioner in Guo. And so, I would urge the court to borrow the test that Guo enunciates. Which is again, that it looks at the totality of the circumstances to see the degree of. Counsel, I understand the argument that you're making. That there are a lot of home churches in China, correct? All across the country. That's correct. And he wants to worship in the home church setting. That's correct. But was prevented from doing so. And I follow that. But, I'm having some problems with part of the evidence in the case. Which was the country conditions report that tells us that in parts of China. These home churches are being permitted to carry on their worship activities. With little if any interference from the government. So, if there's an availability to worship in the very kind of setting that the petitioner wants to utilize. If that's available in other parts of the country. How does that figure in? And isn't that his recourse? I think that that would be a future persecution question, your honor. I think that here the facts are what happened at the home church that he suffered in. Counsel, we have both past and future persecution findings. That's right, your honor. He didn't get the presumption from past persecution. And the agency went on and considered the future persecution issue that Judge Shepard is raising. You can't brush it aside. It is before us. Right. I understand that it is before you, your honor. And what I would say to that very quickly as I like to reserve some time for rebuttal. Is that Mr. He has demonstrated that police keep searching for him after he left the country. They've gone to his father's home. And the friend that introduced him to church testified that he is no longer able to practice in the house church that he attended. And so I think that it would come down to whether the government rebutted, excuse me, the government showed the reasonableness of relocation. Because it is under the regulations when the persecutor is the government, it is on the foreign government. It is on the government to show that. What case holds that when the local government officials are the persecutors that we shift the burden of proof to the government on relocation? Your honor, this case rests on the fact that the Chinese government controls. You say that, but it is not in the evidentiary record. I can't even find in the briefs, and it was hard to find from the record, where it was in southern south coast of China that these events, incidents took place. There's nothing here that would shift, nothing of national governmental interference that would shift the burden. Unless you've got a case that I haven't read. I don't know that it is required to be national, your honor. It should be. Relocation is a local issue. I can pull them up and rebuttal. If I may leave my one minute for rebuttal, I can pull up the regulation citation. I'm not talking about a regulation. You cited cases for this proposition. As far as I know, those cases are discussing when the persecution at issue is of national source or origin. May I reserve my remaining time for rebuttal and answer the question with the cases that I cited in my brief? Your option. Thank you. Mr. Robbins? Hello? I'm trying to call in on the phone. I hear you, but we don't have visual. You can hear me? Because I'm calling in on the emergency phone line to try and make sure that the audio doesn't cut out. But nobody has accepted me into the meeting? I can hear you fine, I think. As well as, I can hear you as well. You're hearing me on a delay. It's about a 20 minute delay. So I'm trying to call in to avoid any delay in the audio. I called in because they said it was the emergency number to call if the audio wasn't working. We can hear you. Why don't you proceed with the argument? But nobody has let me into the meeting. Thank you. Okay. Thank you. I need to quiet this. Hello? Can anybody hear me? Hello? Can anybody hear me? Hello? Can anybody hear me? Mr. Robbins? We can hear you, but we're getting an echo. Sure. Just a moment. Is it off? Oh, wait a minute. Just a moment. I'm getting an echo on my end. We almost have it. Okay. Can you just turn the sound directly off completely? All the way. Just close it. Shut it down. Yeah, yeah. So no sound comes through. Okay. Good morning, everyone. Actually, good afternoon. I'm sorry. Can everybody hear me okay? Yeah. Yes. Okay. May it please the court. I apologize for all these technical issues. We tested it yesterday and it was working just fine. I don't know exactly what happened here. Well, I'm the exact same equipment attached to a landline. So I'm not sure exactly what went wrong here. But regardless, I was only able to catch snippets of the prior argument. So I will do my best to answer the questions. But just be aware that I didn't catch everything in the opening presentation. The issue in this case is whether or not the record compels reversal of the agency's denial of petitioners' applications for asylum, withholding of removal, and protection under the regulations which implement the Convention Against Torture. Now, from what I could gather from the opening presentation and what is in petitioners' briefing, the primary theme of their argument seems to be that when a government forbids somebody from practicing their religion, that that constitutes religious persecution. And I want to make clear at the outset that the government isn't contesting that when a government forbids somebody from practicing their religion, that that doesn't constitute religious persecution. What we are disputing in this case is that the record in this case compels the conclusion that the Chinese government in this case was forbidding the petitioner from practicing his religion. Now, there are several findings by the agency in this case. The first was a finding that the petitioner did not suffer harm rising to the level of persecution. The second is that he could relocate in China based on evidence that demonstrated that the Chinese authorities' bothering and harassment of these underground churches was localized and was uneven throughout the country. And then the third finding is that the petitioner did not establish an independent, objective, well-founded fear of future persecution. Just to be clear, I want to make clear, can everybody still hear me? Because it doesn't sound like... Yes. Oh, you can. Okay. Okay, I just wanted to make sure. So, beginning with the issue of past persecution. The board and the immigration judge in this case reasonably determined that the mistreatment that petitioner suffered in this case, though deplorable, was not sufficiently severe enough or extreme enough to constitute persecution within the meaning of the Immigration and Nationality Act. Now, petitioner has suggested... Yes? Did somebody have a question? Proceed. Oh, okay. The petitioner's case has suggested that the court should review the finding of past persecution de novo. At least, that's what they argued in their briefing. But I would respectfully point out that that is contrary to really decades of jurisprudence, beginning with the Supreme Court's decision in INS against Elias Zacharias and continuing through a litany of the cases which are cited in the government's opening brief, which show that the courts review a finding of no past persecution for substantial evidence. And the reason for that is relatively... should be relatively obvious. It's because when the agency is assessing whether a certain type of harm is sufficient to rise to the level of past persecution, that's a very fact-intensive inquiry. It's not as though there's some sort of grid that says that, you know, X amount of detention or X amount of physical harm is going to be sufficient to rise to the level of persecution. It's a matter for the fact finder to determine based on a host of factors. It has to consider the context. Well, counsel, excuse me, can you hear me? Judge Volkin? I can. It's clearly a... it's a classic mixed question of fact and law, right? That's true, Your Honor. And the Supreme Court, whenever they're pushed to say one way or another, invariably applies, at least on a de facto basis, they don't go to review. Well, I'm not... And we have two cases, at least, that say that the ultimate question of past persecution, after you get through whether there are clearly erroneous fact findings, is we review de novo. In other words, it's an issue of law. Now, to me, what the cases that are along the same lines consistently ignore is where agency deference comes into play in that de novo review. Now, if you want to keep saying it's fact, that's fine, but I've told you where I think the tough question is here. Well, Your Honor, I agree with you that de novo review is appropriate when there are undisputed facts. What I would dispute is the notion that the facts are undisputed in this case. But that's contrary... Counsel, it's contrary to any circuit law. And Ninth Circuit Law and three or four other circuits. And the BIA can keep saying that, and your agency can keep arguing it. But we're bound otherwise. Respectfully, Your Honor, the facts in this case are in dispute. The petitioner is contesting that the facts demonstrate that the Chinese government is going to forbid the practice of his religion. And we are absolutely disputing that fact. That is a fact that is plainly in dispute in this case. And we would say to Elias Zacharias and a host of other cases that have repeatedly reviewed findings of no past persecution under the substantial evidence standard. I mean, all the cases apply the substantial evidence standard with respect to those particular findings. And again, the facts in this case are absolutely in dispute. Now, it's true that it's not in dispute his claim that he was of the specific mistreatment that he suffered. And, of course, we've cited a case law which has pointed to situations where individuals have suffered a similar or, in some cases, more severe mistreatment than petitioner. Where the court has, under the substantial evidence standard overview, upheld findings of no past persecution. So, for example, we've pointed to cases where the individual was detained for a month. Or, in one case, there was two months. We've pointed to cases where individuals suffered more severe physical mistreatment than petitioner suffered in this case. Counsel, how could he have... I'm going to ask a reverse question. Which is, in the government's view, how could he have practiced his religion in China? Well, it's difficult to answer that question, Your Honor, because petitioner didn't really provide a lot of evidence about how he practices his Christianity. There have been cases in the past, for example, where an individual practices a particular sect of Christianity that is disfavored or disapproved of by the Chinese authorities. But the problem in this case is that petitioner didn't provide any information about his house church that would indicate that he would not be able to practice in one of the sanctioned churches or one of the sanctioned religions. Why isn't that enough? There are many, many, many home churches in China. We know that. The country conditions reports talk about that. Why shouldn't that be a permissible way of practicing his religion, namely, worshiping in a home church environment rather than in the state sanctioned church environment? That's what he says he wants to do, and he was taken into custody twice for doing that. Well, Your Honor, I would refer Your Honor to a decision by this court. It's unpublished, so I grant you that it's not binding. But it was a case that dealt with this precise issue and I think is persuasive in that it speaks to the answer. I think it goes a long way towards answering Your Honor's question. I'm referring to the Zhang case from 2017, which is cited in the government's brief. In that case, the court held, and I'll quote, where home churches are more widely accepted by the Chinese government, and it upheld the finding for substantial evidence. Now, I see no reason why that particular reasoning wouldn't be equally applicable to the petitioner's case here. But we know here, the difference, I think, with that case is we know here that when he did try to practice in a home church twice, not just once, he was taken into custody. So doesn't that make it different than the case you were citing to us? No, the other case, well, I'll grant you the other case was only one instance where he was, where they went after him, as opposed to in this situation where there were two instances. But in assessing past persecution, the board has to make a judgment call about whether this is a situation where an individual is being continually targeted for persecution, or whether these essentially amount to isolated incidents. Now, I agree with, I would agree with the notion that this is a very close call because of the two different times. But there's no evidence that petitioner was specifically being targeted because of his religion. Mind you that he has never claimed to be anything but an ordinary practitioner of Christianity. He's never really provided any information as to which denomination that would be. And he's never really explained why he wouldn't be able to attend or practice his religion by attending one of these registered churches. Now, if he had provided information to that effect, it might be a different case. But he basically said that he didn't attend the registered churches because he thought that he would receive the same treatment as he did in his house church. But then he later admitted that he'd never heard of anybody having any problems in the registered house churches. So it really comes down to, just to follow up, it really comes down to what I asked about opposing counsel earlier, which is it comes down to the lack of findings by the immigration judge and the BIA that he couldn't practice his religion elsewhere, and the fact that he may not have provided enough evidence for them to have made that conclusion. Yes, I would characterize it as an insufficient evidence presented by petitioner to make that showing. And when there's insufficient evidence, that makes it mean that the fact finder is going to be in a position where they have to make inferences. And whenever you have to make inferences based on a lack of evidence, that means that different fact finders might take different views of the evidence. And under the standard of review, if a fact finder could go both ways on the evidence, then the record doesn't compel one conclusion over the other. And that is, of course, the standard of review which this court should apply to the finding of no past persecution in this case. Now, I would also point out that the petitioner in this case also, or excuse me, the agency in this case also found that the petitioner could not, did not establish that he could not be reasonably expected to relocate. And of course, the board specifically cited to the evidence in the record which demonstrates that, which demonstrates that individuals in house churches, although they've been regularly harassed in some areas, groups in other areas reported that they had more freedom in the past to conduct these services as long as they kept their gatherings private and minimal, akin to what petitioner was doing in this case in the two instances where the Chinese government bothered him. And certainly, we don't think that given that affirmative evidence in the record, that the record wouldn't compel a contrary conclusion to that of the agency with respect to the issue of relocation. And sort of blended into that analysis a little bit is the agency's finding that there is no well-founded fear of future persecution. Again, the agency pointed out here that there are many, many religious adherents in China. There are 70 million Christians. The Catholic and Protestant denominations are sanctioned by the Chinese government. Petitioner has never claimed to be anything other than an ordinary practitioner. He's never claimed to be anybody in a position of authority or influence, something that would draw the attention of the Chinese authorities or the Chinese government. In fact, these two instances where he faced problems with the Chinese authorities, with the local authorities, were situations where apparently his first and second time ever practicing Christianity. So, there's really no indication in the record that would compel a conclusion that the Chinese government is going to target him or single him out and prevent him from practicing Christianity throughout China. Now, I'm sorry, I don't have a clock because I'm going on the phone. What about a Christian sect or faith that is not within the registered universe in China? Jehovah's Witnesses might be an example. There are actually quite a number. If a Jehovah's Witness went in a homeschool once or even once and was treated like this, is he or she eligible for asylum? Well, actually, if you read the country reports, there are actually quite a number of sects that are viewed with particular disfavor by the Chinese government. Why don't you answer the question? The answer is maybe, Your Honor, depending on the evidence presented. But I would say the answer is it could. It could establish a claim potentially. So, for example, if you look at the country reports, what the evidence demonstrates is that the Chinese government views with disfavor a number of Christian sects. For example, the Shouters. My office sees a lot of cases involving the Shouters. When it's a specific sect that is disapproved of by the Chinese government, I think the claim for persecution is much, much stronger. But when it is a sanctioned religion by the government, the claim will obviously be much weaker. But Petitioner did not claim to be a member of one of these particular sects. If you actually look at the International Religious Freedom Report, you'll see that the Freedom Report actually goes through a litany of the different sects that the Chinese government specifically disfavored. But I do think that in certain situations, that if an individual could show that they were in one of those disfavored sects, that the country condition reports and their testimony might be enough to demonstrate that they would face harm in the future. But, of course, that would be a case-by-case analysis. And what about someone who denies one god and denies that the Communist Party of China is worthy of faith? In other words, a multi-god adherent from the Greek or Roman or Viking eras. Your Honor, it's difficult to say without evidence with respect to a specific religion or a specific sect. The reason that I say that the specific sects which are enumerated in the Religious Freedom Report, I think there is... Let me stop you there. I know if we had facts regarding past persecution, that'd be one thing. But we're kind of doing this on a more theoretical level. And so, does my multi-god adherent in a theocracy that believes otherwise or preaches otherwise, does every multi-god adherent have a well-founded fear? That would depend on two things, Your Honor. Because there are two ways you can establish a well-founded fear. You can establish either that you have an individualized likelihood of being singled out or you could demonstrate that there is a pattern and practice against that particular faith. So, I guess it would depend largely on whether the evidence showed that either there was a pattern and practice against the specific faith in question or whether the petitioner had presented specific individualized evidence that he would face harm on the basis of whatever that multi-god religion would be. Is the harm that there would be no place to practice my religion other than my basement, is that sufficient? Well, I guess there would have to be evidence as to what is required in order to properly practice one's faith. The problem in this case, of course, is that petitioner did not provide any evidence that he would not be able to properly pursue his faith with one of the registered churches. Because the only reason that he gave for not practicing in one of the registered churches was that he thought that he would be treated the same as he was with the house churches. But then he later admitted that he had never heard of anybody in those churches having any problems. So, his testimony was really quite vague and didn't really provide the answer to that question in this case. But I would say, Your Honor, that it's ultimately a case by case analysis. Okay. It's time for rebuttal. Thank you very much for your time, Your Honors. Certainly. It's an interesting case. I'll give you a minute for rebuttal. Thanks, Your Honor. I would like you to distinguish Zhang, the unpublished case cited by counsel. I was going to ask you that before. Absolutely, Your Honor. And it relates to the point that I would really like to make here. Is that the opposing counsel, I'm sure it's an oversight, but it's false that his testimony was simply that he didn't know about these churches. At AR 131, he is very emphatic that he would not go to those state-controlled churches because he understands that the doctrine is controlled and he cannot learn about his Christianity in those churches. And that is precisely how Zhang is distinguishable. And we distinguish that in our reply brief. And that in that case, there was no such credited testimony by the petitioner in that case that he would not actually go to those state-controlled churches because he understood the restraint that those churches would impose on his free religious practice. And there is credited testimony in this case by Mr. Hu that is emphatic about that. Government counsel says that the facts are in dispute here, but he never really quite identified what's in dispute. The universe of facts in this case is that Mr. Hu went to church, was beaten, berated, imprisoned for 15 days first, and told not to go back to church. Then he went back. Again, he testified because of how he was called to Christianity. And then it escalated, where he was now in prison for a full 45 days. And thereafter, released on the condition that he report weekly. Your Honor, and that's just not in dispute. I'm out of time, Your Honor, but I will owe the court a 28-J on the issue of the regulations that Judge Logan, you asked me about, and the case, Yang, that we cite in our briefs. Very good. Very good. Counsel, thank you. The case has been well-briefed and arguments have been very helpful and interesting. And we'll take it under advisement. Thank you, Your Honor.